UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EUGENE MARTIN LAVERGNE, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES HOUSE OF REPRESENTATIVES, *et al.*,<br><br>*Defendants*. | Civil Action No. 17-793 (CKK-CP-RDM) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs have a bold theory. For more than two centuries, our nation has been operating under the following upper and lower bounds on the number of seats Congress may constitutionally authorize in the House of Representatives: "The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative." U.S. Const. art. I, § 2, cl. 3. Acting within that range, Congress a century ago settled on 435 House seats. But plaintiffs say that we have overlooked a valid constitutional amendment that requires something different. They urge this court to recognize that the Constitution mandates "not . . . less than two hundred representatives, nor less than one representative for every fifty thousand persons"—a framework that would by now mandate well over six thousand House seats. They date the wrong turn to a failure to recognize that an amendment to the Constitution proposed in 1789 as "Article the First" was, they believe, validly ratified by 1792 at the latest.

In 1789, Congress proposed twelve amendments to the Constitution. Ten of them were promptly ratified by the states and are now known as the Bill of Rights. Much later, in 1992, the states completed their ratification of one more of those proposed amendments, "Article the

Second," and the Archivist of the United States so certified. But the states never ratified the first proposed amendment, Article the First—at least, neither Congress nor the Archivist ever thought they did. Plaintiffs now claim that the states in fact did validly ratify Article the First in the eighteenth century. They accordingly ask this court to order that Congress is constitutionally required to add at least 5,795 seats to the House of Representatives and apportion them among the states, and to invalidate legislation Congress enacted without the requisite 3,116-member quorum.

Defendants have moved to dismiss, raising several defenses. We reach only two: We hold that plaintiffs' Article-the-First challenge depends on a nonjusticiable political question, and that the one plaintiff who additionally attacks the federal apportionment statute, 2 U.S.C. § 2a, has failed to establish his standing.

## BACKGROUND

### A. Article the First and the Apportionment Statute

In 1789, Congress approved and sent to the states for ratification a constitutional amendment—Article the First—that, according to historical consensus, was never ratified by three quarters of the states. In plaintiffs' view, that consensus is mistaken. They contend that Article the First was ratified in 1790 and thus binds us today. They further claim that the version of Article the First that Congress sent to the states for ratification included a scrivener's error that we must now correct. If Article the First were ratified, and if it were also "corrected" to require "no[t] *less*"—as opposed to *more*—"than one representative for every fifty thousand persons," plaintiffs assert, the current House of Representatives would need to have at least 6,230 members to represent the United States population of more than three hundred million. If the "corrected" Article the First had been ratified when plaintiffs contend it was, countless congressional actions long accepted as binding would have lacked the requisite quorum.

2

Plaintiff Neuman filed a supplemental challenge to the apportionment statute, 2 U.S.C. § 2a. Section 2a addresses how representatives are to be divided among the states and, if the number of Representatives changes, how they are to be assigned to the existing congressional districts until redistricting occurs. Section 2a, Neuman asserts, violates the separation of powers and the principle of "one person, one vote."

Without Article the First, the Constitution provides that seats in the House of Representatives "shall be apportioned among the several States . . . according to their respective Numbers," and that "[t]he Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative." U.S. Const. art. I, § 2, cl. 3; *see also* U.S. Const. amend. XIV, § 2. Before the 1920s, Congress determined the precise number and apportionment of representatives after each decennial census, in accordance with Article I, section 2 of the Constitution. Following the 1920 census, however, Congress deadlocked and failed to pass a new apportionment. To avert future deadlock, Congress enacted a formula to automatically apportion representatives after each census. *See* 2 U.S.C. § 2a. The apportionment statute provides that, based on the census results, "the President shall transmit to the Congress a statement showing the whole number of persons in each State . . . and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member." *Id.* The "then existing number" of representatives was and is 435, *see* Apportionment Act of 1911, Pub. L. 62-5, 37 Stat. 13; Reapportionment Act of 1929, 46 Stat. 21, § 22, and the method of equal proportions divides the representatives amongst the states according to their relative populations, *see United States v. Montana*, 503 U.S. 442, 455-56 (1992). As a

result, the House of Representatives currently has 435 members, apportioned based on the relative populations of the states, with at least one representative from each state.

Article the First would have set different benchmarks for the ratio between the national population and the number of representatives in Congress, as follows:

> After the first enumeration required by the first article of the constitution, there shall be one representative for every thirty thousand, until the number shall amount to one hundred, after which the proportion shall be so regulated by Congress, that there shall be not less than one hundred representatives, nor less than one representative for every forty thousand persons, until the number of representatives shall amount to two hundred; after which the proportion shall be so regulated by Congress, that there shall not be less than two hundred representatives, nor more than one representative for every fifty thousand persons.

Am. Compl. 156 (Ex. J) (Acts Passed at a Congress of the United States of America (Francis Childs and John Swaine, publishers)). That is the text that Congress proposed to the states for ratification. *See* Appendix, Proposed Amendments to the Constitution, in *A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774-1875*, at 96 (copy of proposed amendments from appendix to Senate Journal).[1] Plaintiffs, however, believe that Article the First should say something slightly—but significantly—different. As they would have it, the Article's final clause was meant to require no "*less* than one representative for every fifty thousand persons," rather than no "*more*." Am. Compl. 37-39, ECF No. 4.

Some context is needed to understand that contention. Before Congress proposed the twelve draft amendments to the states for their ratification, it debated them and made some alterations. The version of the amendment memorialized in an August 24, 1789, House resolution did say "less" in one place where the version sent out for ratification ultimately said "more"—in

---

[1] *See also* Appendix to Gales and Seaton's History of Debates in the First Congress, in *A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774-1875*, at 2033-34 (New York's ratification of the above text); Primary Documents: The Bill of Rights, Library of Congress Web Guide, https://www.loc.gov/rr/program/bib/ourdocs/billofrights.html.

the very last clause, shown below as the fourth to last word in the penultimate line (printed with the following line breaks in the engrossed version):

> After the first enumeration required by the first Article of the
> Constitution, there shall be one representative for every thirty thou-
> sand, until the number shall amount to one hundred, after which
> the proportion shall be so regulated by Congress, that there shall
> be not less than one hundred Representatives, nor less than one Re-
> presentative for every forty thousand persons, until the number of
> Representatives shall amount to two hundred; after which the pro-
> portion shall be so regulated by Congress, that there shall not be less
> than two hundred representatives, nor *less* than one Representative
> for every fifty thousand persons.

Am. Compl. 145 (Ex. G) (emphasis added); *see also* Journal of the Senate (September 9, 1789), in *A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774-1875*, at 76-77 (concurring in the House's resolution). The next month, the Conference Committee, in its report to the House and Senate, stated that "it would be proper for both Houses to agree to amend the first Article, by striking out the word 'less' in the last line but one and inserting in its place, the word 'more,' and accordingly recommend that the said Article be reconsidered for that purpose." Am. Compl. 150 (Ex. H). That same day, the House resolved "that the first article be amended by striking out the word 'less,' in the last place of the said article, and inserting, in lieu thereof, 'more.'" Of Debates in Congress, in *A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774-1875*, at 948; *accord* Am. Compl. 153 (Ex. I). The Senate concurred in the amendments the following day. *See* Journal of the Senate (September 25, 1789), in *A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774-1875*, at 88. The change was thus made, and Congress sent the version of Article the First so amended—the first version we quote in full above, on page 4—to the states for ratification.

According to plaintiffs, however, the "lines" Congress referred to were not the lines of text on the page; rather, they say, Article the First comprised only three "lines," each of which corresponded to a phase of apportionment, like so:

> **[Line 1]** After the fi[r]st enumeration required by the first Article of the Constitution, there shall be one representative for every thirty thousand, until the number shall amount to one hundred, **[Line 2]** after which the proportion shall be so regulated by Congress, that there shall be not less than one hundred representatives, nor less than one representative for every forty thousand persons, until the number of representatives shall amount to two hundred; **[Line 3]** after which the proportion shall be so regulated by Congress, that there shall not be less than two hundred representatives, nor less than one representative for every fifty thousand persons.

*See* Am. Compl. 38. Plaintiffs seem to believe that the words "last line but one" in the Conference Committee's suggestion referred to their own version of "Line 2," and so affected the second rather than final apportionment phase. The "less" that should have been changed to a "more," they say, was the second "less" in the paragraph. In other words, according to plaintiffs, once the Conference Committee's change was made, Article the First should have read:

> After the first enumeration required by the first Article of the Constitution, there shall be one representative for every thirty thousand, until the number shall amount to one hundred, after which the proportion shall be so regulated by Congress, that there shall be not less than one hundred representatives, nor *more* than one representative for every forty thousand persons, until the number of representatives shall amount to two hundred; after which the proportion shall be so regulated by Congress, that there shall not be less than two hundred representatives, nor *less* than one representative for every fifty thousand persons.

Am. Compl. 39-40 (second emphasis added). Plaintiffs characterize the discrepancy as a mere "scrivener's error" *id.* at 37, and ask us to "ignore the error" and "declare and confirm that [plaintiffs' version is] the correct, fully ratified and consummated, literal text of Article the First," *id.* at 40. Plaintiffs do not deny, however, that the version that Congress approved and sent to the

states, as well as all subsequently published versions, contain the very "error" they would have this court remedy. *Id.* at 39.

In addition to asking us to correct the text of Article the First, plaintiffs urge us to adopt a novel historical understanding of the states' ratification activity. According to their view, Article the First was ratified by three quarters of the states, as Article V of the Constitution requires for an amendment to become effective. By 1792 at the latest, plaintiffs say, some combination of three states—Connecticut, Virginia, and Kentucky—ratified Article the First, that those ratifications (along with those from additional states that ratified without question) accomplished the necessary approval by three quarters of the states, but that they were erroneously either not counted early enough or were not counted at all. No matter that neither Congress itself, nor the Executive or its official Archivist, has ever seen it that way. Plaintiffs view it as the court's role to set the historical record straight and recognize Article the First as part of our Constitution.

According to plaintiffs, Connecticut ratified Article the First in either 1789 or 1790, Virginia in both 1789 and 1791, and Kentucky in 1792. In its 1789 session, a majority of the lower house of the Connecticut legislature voted in favor of the amendment but the upper house did not; in the 1790 session, a majority of the upper house voted in favor but the lower house did not. As plaintiffs see it, "the ratification vote in a State Legislature is not part of a regular State Law making process requiring the participation or approval of any State's Executive Branch or adherence to any other State Law making process or procedure," but only requires "an affirmative vote of assent of the entirety of a 'State's Legislature.'" Am. Compl. 25-26. If a vote need not have amounted to legislative action under Connecticut law to count as ratification under the United States Constitution, plaintiffs reason, one or both of the votes of the state's legislative chambers in different sessions could have sufficed as Connecticut's ratification.

Plaintiffs also contend that Virginia, for its part, validly ratified Article the First in 1789, even though it failed to report that it had done so. Plaintiffs object that Virginia's ratification was officially recognized only after that state voted again, in 1791, in favor of the amendment and reported that vote.

Kentucky, the Plaintiffs assert, ratified the amendment in 1792, and it was error for the national government to fail to count it merely because Kentucky never officially reported its ratification to Congress. Here, too, Plaintiffs assert that "[w]hether or not an amendment . . . has been 'officially reported' to the other States or to any organ of the Federal Government does not affect the legal sustaining validity of a State Legislature's ratification vote once cast." *Id*. at 26.

Connecticut's ratification—either in 1789 or 1790—is the linchpin of plaintiffs' contention that Article the First was validly ratified. Unless they are right about Connecticut, even by plaintiffs' account it cannot matter in which year Virginia ratified nor whether Kentucky ever did.

A bit more historical context helps in understanding plaintiffs' contentions about state ratification. New states were joining the Union while Article the First was pending states' ratification. In the initial period after Congress sent Article the First to the states, nine state approvals would have constituted the constitutionally required three quarters of the states needed for ratification. Once Rhode Island joined the Union in May 1790, however, ratification required approval of at least ten states. Even using the earliest ratification dates plaintiffs ascribe to Connecticut and Virginia, state ratifications fell short of nine during the entire period when nine states would have sufficed. September 1791 was the first time that, using plaintiffs' own count, as many as ten states had ratified—but by that point, eleven states were needed. Under plaintiffs' theory, full ratification would have been achieved on November 3, 1791, with Vermont and Virginia's reported ratifications. The validity or not of Virginia's unreported 1789 ratification

8

vote is thus irrelevant to plaintiffs' claim, as full ratification under plaintiffs' theory would not have happened any sooner even if that ratification were valid.

The unreported action by Kentucky in 1792, on which plaintiffs purport to rely, is also immaterial to their claim. If Connecticut is counted as having ratified, then Article the First had already been ratified by three quarters of the states (eleven out of the then-fourteen states) before Kentucky even joined the union. On the other hand, if Connecticut is not counted as having ratified, then there were already too many non-ratifying states (four out of the then-fifteen states) for Kentucky to make up the shortfall by the time it did join the union and ratify the amendment in 1792. In short, plaintiffs' contention that the requisite number of states ratified Article the First hinges exclusively on its contentions about Connecticut's ratification.

**B. Procedural History**

Eugene LaVergne, Frederick LaVergne, Scott Neuman, Leonard Marshall, and Allen Cannon filed this lawsuit in April 2017. They sued the U.S. House of Representatives and all of its members, the U.S. Senate and all of its members, the United States, and other federal officials ("the federal defendants"), as well as officials from each of the fifty states ("the state defendants").

Plaintiffs seek an array of remedies. First, they ask us to issue an order "correct[ing]" the supposed "scrivener's error" in the version of Article the First that Congress approved and sent to the states for ratification. Am. Compl. 40. Second, they request mandamus requiring state officials in Kentucky, Connecticut, and Virginia to provide "official notice" of their states' ratification, *id.* at 36-37, the Archivist of the United States to certify the amendment as ratified, and state and federal officials to implement a new apportionment scheme. Third, they seek a declaratory judgment that the apportionment statute, 2 U.S.C. § 2a, is unconstitutional. They would also have us declare all actions of the 115th Congress invalid for lack of a quorum. Finally, they seek an

9

injunction preventing any member of the House of Representatives from conducting business until the requisite number of representatives is elected and sworn into office.

Eugene LaVergne had filed and lost the same Article-the-First challenge in a similar lawsuit in the District of New Jersey in 2011, and the Third Circuit sustained the dismissal on standing and political question grounds. *LaVergne v. Bryson*, 497 F. App'x 219, 220-22 (3d Cir. 2012). In November 2017, defendants moved to dismiss Eugene LaVergne's claims in this case as issue-precluded. We agreed that Eugene LaVergne's Article-the-First claims were precluded and dismissed him from this case. The remaining plaintiffs, who had been proceeding *pro se*, then obtained counsel to represent them going forward.

While the defendants' preclusion motions were pending, plaintiff Scott Neuman obtained leave to file a "second amended complaint"—effectively a complaint on his own behalf supplemental to the pending amended complaint. Neuman added to the Article-the-First challenge his claim that 2 U.S.C. § 2a violates the separation of powers and fails to guarantee "one person, one vote." Mot. For Leave to File Second Am. Compl. 8-15. (Neuman also included but then abandoned a non-delegation claim.)

In September 2018, plaintiffs moved for summary judgment and for a preliminary injunction. Both the federal and state defendants, for their part, moved to dismiss all of plaintiffs' claims for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). Defendants contend that Plaintiffs have not alleged any concrete and particularized injury-in-fact, so lack standing as to all of their claims. They also assert that the Article-the-First claims present a nonjusticiable political question. The state defendants urge that Neuman's challenges to section 2a are nonjusticiable political questions, and that all of the claims should alternatively be dismissed as unripe, barred by sovereign immunity,

and for want of personal jurisdiction over any of the defendants.)  Finally, both the federal and state defendants contend that Plaintiffs have failed to state a claim cognizable on its merits.

During briefing of the current motions, Plaintiffs withdrew their motion for summary judgment and abandoned their request for a preliminary injunction.  They also voluntarily dismissed their claims against most of the defendants.  The remaining federal defendants are the Archivist of the United States, the United States Secretary of Commerce, and the President of the United States.  The remaining state defendants are the state officials of Kentucky, Connecticut, and Virginia.  The claims against all other defendants have been voluntarily dismissed from the case.

## ANALYSIS

We hold that plaintiffs' Article-the-First Claims are barred by the political question doctrine, and plaintiff Neuman's challenges to 2 U.S.C. § 2a fail for lack of standing.  We thus grant defendants' motions to dismiss the case.

In ruling on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), we look to plaintiffs to carry the burden to allege jurisdictional grounds.  *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182 (1936).  We may resolve a Rule 12(b)(1) motion on the complaint alone, *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *accord* 5B Charles A. Wright & Arthur Miller, *Federal Practice and Procedure* § 1350 (3d ed. 2019).

**A.  Plaintiffs' Article-the-First claims present a nonjusticiable political question.**

The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am.*

*Cetacean Soc'y*, 478 U.S. 221, 230 (1986). In *Baker v. Carr*, the Supreme Court provided a non-exhaustive list of situations in which a political question exists, including when there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." 369 U.S. 186, 217 (1962).

Plaintiffs' Article-the-First claims are barred by the political question doctrine because they hinge on the plaintiffs' scrivener's error argument. For plaintiffs to prevail, they would need us to "correct" the text of Article the First that Congress approved and sent to the states for consideration and ratification. But Article V of the United States Constitution states that "[t]he Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution," which "shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States." U.S. Const. art. V. In other words, the Constitution expressly commits to the Congress the task of proposing amendments to the states. *See Hawke v. Smith*, 253 U.S. 221, 227 (1920) ("The fifth article is a grant of authority by the people to Congress."). Article V does not contemplate a role for the judiciary in correcting Congress's drafting of the text of an amendment it sends to the states for their approval. We lack constitutional authority to say that Congress meant to propose a different version of Article the First.

Plaintiffs devote significant energy to discussing the meaning and disputing the force of the Supreme Court's decision in *Coleman v. Miller*, 307 U.S. 433 (1939), which defendants cite for the proposition that "the efficacy of ratifications by state legislatures . . . should be regarded as a political question." Mem. in Supp. of Fed. Defs.' Mot. to Dismiss 14-15; State Defs.' Mot. to Dismiss 9 (quoting *Coleman*, 307 U.S. at 450 (plurality opinion)). Plaintiffs can only make headway on their claims if they prevail on their scrivener's error argument. If the text is not

12

"corrected" in the way plaintiffs propose, it does not matter how many states ratified Article the First. The justiciability of plaintiffs' challenge to Congress' and the Archivist's failure to count more states as having ratified Article the First is thus an issue we need not reach.

Our conclusion that the plaintiffs' Article-the-First claims present a nonjusticiable political question should not be taken to include any implicit holding that the plaintiffs have standing to pursue those claims. In disposing of the case on one threshold, non-merits ground, we need not resolve in plaintiffs' favor disputes as to any other such ground. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999).

**B. Plaintiff Neuman lacks standing to challenge 2 U.S.C. § 2a.**

Neuman lacks standing because he has failed to identify how the challenged apportionment statute harms him. A plaintiff must show standing in order to assure the court that "there is a real need to exercise the power of judicial review in order to protect the interest of the complaining party." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974). In particular, a plaintiff must show that he has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). The injury must be fairly traceable to the defendants' conduct, and it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted). An "institutional injury" that necessarily damages all voters equally is not enough. *Raines v. Byrd*, 521 U.S. 811, 821 (1997). Without a "personal stake" in the litigation, a plaintiff cannot establish standing. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983); *Raines*, 521 U.S. at 819.

Neuman offers broad-brush descriptions of types of putative harms he associates with section 2a, unmoored from specifics about the harm he claims here, its cause, and how a judicial order in his favor could remedy it. He accordingly does not meet the requirement to identify concrete, particularized, non-speculative injury he suffers that could be redressed by a favorable decision. He states that the statutorily prescribed method of equal apportionment harms him because it "discriminates to an unconstitutional degree in favor of larger populated states to the detriment of smaller populated states," and "provides a distinct and clear and constitutionally unfair statistical advantage to larger populated states over less populated states." Mot. For Leave to File Second Am. Compl. 10, 14. That conclusory allegation, however, is not enough to carry his burden, even at this early stage of the proceeding. Neuman fails to allege specific facts to support his claim that section 2a's method of apportionment has caused him, or is likely imminently to cause him, a concrete, particularized injury.

The only concrete information Neuman alleges is that he resides in New Jersey—he then asserts that "Texas has been unconstitutionally apportioned one extra Representative that should have been apportioned to either New Jersey or Louisiana," *id.* at 14, and that "the apportionment in question dilutes the[] individual votes" of New Jersey residents. Pls.' Opp'n 4. But Neuman fails to explain how New Jersey would gain a representative if the method of equal proportions were invalidated. Indeed, he fails to allege any facts as to what apportionment regime he believes would apply in its stead. Because Neuman has not identified how invalidating section 2a would address his alleged harm, he lacks standing to seek such invalidation.

Neuman appears to assume that other plaintiffs' standing in cases challenging applications of section 2a necessarily supports his own standing in this case. He correctly notes that "[t]he Supreme Court has previously allowed judicial challenges to 2 U.S.C. [§] 2a," *id.* at 5 (citing *Dep't*

14

*of Comm. v. Montana*, 503 U.S. 442 (1992), and *Franklin v. Massachusetts*, 505 U.S. 788 (1992)), but the identification of concrete injuries from specified apportionment decisions challenged in other cases does not define redressable injury on these facts. Unlike in *Franklin*, where the Massachusetts-voter plaintiffs had identified how the United States Secretary of Commerce's allocation of overseas military personnel had caused a shift of a representative from Massachusetts to Washington state that could be redressed by declaratory relief, 505 U.S. at 790-91, Neuman does not allege how the representative assigned to Texas would, if section 2a were invalidated, be assigned to New Jersey. And the Court in *Department of Commerce v. Montana* never discussed plaintiffs' standing; it rejected the government's contention that the claim was a nonjusticiable political question before it proceeded to sustain on its merits the results of post-1990 census reapportionment that caused Montana to lose a House seat. 503 U.S. at 458-59, 465-66. Neuman also cites *Department of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999), but that case is even further afield. In seeking to invalidate the Department of Commerce's plan to use statistical sampling to perform a part of the census, the Indiana-resident plaintiffs there provided an expert affidavit showing that Indiana was "virtual[ly] certain" to lose a seat due to undercounting caused by the challenged plan. *Id.* at 330. Neuman has not alleged anything comparable.

In sum, Neuman appears to claim that he lost out on a representative between the 2000 and the 2010 census. But he does not explain how invalidation of section 2a—which governed both apportionments—would lead to any identified alternative method of apportionment, nor how such method would cause him to regain the claimed lost representation. Because Neuman has not alleged concrete and particularized injury caused by section 2a that would be redressed by its invalidation, he lacks standing to challenge that provision here.

15

## CONCLUSION

For the reasons discussed above, the federal and state defendants' motions to dismiss plaintiffs' claims are GRANTED and the case is DISMISSED.

*So ordered.*

  /s/ Cornelia T.L. Pillard
CORNELIA T.L. PILLARD
United States Court of Appeals Judge

  /s/ Colleen Kollar-Kotelly
COLLEEN KOLLAR-KOTELLY
United States District Judge

  /s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:   June 11, 2019